# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

JACQUELINE L. SCOTT, JEFFERY A.   )
SCOTT, and JENNIFER A. SCOTT,   )
   )
       Plaintiffs,   )
   )   Case No. 09-4241-CV-C-NKL
       v.   )
   )
THE PUBLIC SCHOOL RETIREMENT   )
SYSTEM OF MISSOURI, TINA ZUBECK, )
WAYNE WHEELER, DONALD CUPPS,  )
YVONNE HEATH, AARON ZALIS, M.  )
STEVE YOAKUM, RONDA PETERSON,  )
SCOTT HUNT, and DEBORAH K. SCOTT )
   )
   )
       Defendants.

# ORDER

Plaintiffs bring this action under 42 U.S.C. § 1983, seeking declaratory and equitable relief based on the refusal to pay certain death benefits. The named Defendants are Deborah Scott, the Public School Retirement System of Missouri ("PSRS"), and Tina Zubeck, Wayne Wheeler, Donald Cupps, Yvonne Heath, Scott Hunt, Aaron Zalis, M. Steve Yoakum, and Ronda Peterson (collectively, "the individual PSRS Defendants"). Before the Court are the Motion for Summary Judgment filed by the individual PSRS Defendants [Doc. # 94] and the Motion for Summary Judgment filed by Deborah Scott [Doc. # 100]. For the following reasons, the Court denies both motions.

## I.  Background[1]

### A.  The Parties and the Oral Agreement

The individual PSRS Defendants include Tina Zubeck, Wayne Wheeler, Donald Cupps, Yvonne Heath, Aaron Zalis, and M. Steve Yoakum – members or officers of the PSRS Board sued in their official and individual capacities. Individual PSRS Defendant Ronda Peterson, also sued in her official and individual capacity, is the Director of Member Services within the PSRS and is responsible for supervising the entire staff. Plaintiffs allege that PSRS and the individual Defendants named above acted under the color and pretense of the statutes and legal authority of the State of Missouri.

Plaintiff Jacqueline L. Scott was married to James Scott for thirty-four years, beginning in 1971. Their children are Plaintiffs Jeffery A. Scott and Jennifer A. Scott, both adults. Jacqueline and James were both public school teachers.

In 1973, Jacqueline became a member of PSRS, a public school teachers retirement system created by Missouri law. James became a PSRS member in 1987. During their marriage, each spouse was the named beneficiary of the other's PSRS account, with their children Jennifer and Jeffrey as contingent beneficiaries. Jacqueline retired and started collecting PSRS retirement benefits in 2002. When Jacqueline retired, she selected retirement plan Option 2 and named James as her beneficiary. Under Option 2, Jacqueline

---

[1]The Court has considered the parties' statements of undisputed fact which are supported by evidence. In considering each party's motion, the Court has drawn all inferences in favor of the non-movant.

could not change her designated beneficiary unless James died or Jacqueline remarried and named her new spouse as her survivor beneficiary within ninety days of the remarriage.

In September 2004, James informed Jacqueline of his relationship with Defendant Deborah Scott. In October 2004, James and Jacqueline separated. On October 26, 2004, Jacqueline called PSRS and was told that she could not remove James as her Option 2 beneficiary. Alan Thompson, PSRS General Counsel, provided Jacqueline with a November 3, 2004 affidavit stating that Jacqueline was receiving a monthly benefit of $2,857.31 under Option 2, as opposed to the $2,985.49 she would have received under Option 1. On November 3, 2004, PSRS also provided to Jacqueline a document titled "The Effect of Divorce on PSRS/NTRS Benefits," which stated:

> [I]f an active PSRS/NTRS member has designated his/her spouse or a relative of his/her spouse as the survivor beneficiary of the member's retirement benefits, and the member later obtains a divorce, pursuant to Section 461.051 RSMo., the ex-spouse . . . shall automatically be removed as beneficiary as of the date of the divorce by operation of law.
> . . .
> [I]f a retired PSRS/NTRS member has listed his/her spouse as the survivor beneficiary of the member's retirement benefits, and then later obtains a divorce, the effect of divorce varies with the type of benefit payment(s) the spouse was scheduled to receive. . . . Under options 2, 3, or 4, the only circumstance where the ex-spouse can be removed as beneficiary is where the divorce decree provides that the member has sole retention of all rights in the retirement benefit and the member has remarried and the member substitutes the new spouse as the survivor beneficiary.

[Doc. # 95, Ex. C at 5.]

Between the time of their separation and the divorce, James and Jacqueline discussed PSRS beneficiary designations at least five times. The discussions took place at Jacqueline

and James's family home.  The first time Jacqueline brought up the PSRS designations with James was just to say that the situation was unfair.  It took more than two or three discussions before they arrived at an oral agreement in November or December of 2004.  Jacqueline testified:

> James is a quiet man, and so he just listened mostly.  And when I finished telling him how unfair I thought it was, he said the only thing that he could do to make it fair would be that he would make sure that Deborah and her children would not receive one cent of my money. . . . That he would divert it to Jeffrey and Jennifer in equal parts, and that he would like his own retirement done the same.

[Doc. # 110, Ex. 5 at 105.]  Jacqueline also testified:

> [H]e told me that he would not allow Deborah and her family to have any of my teacher retirement, and that he wanted me to do likewise.  He would keep me as beneficiary and I would disburse my money to the children for education and help in whatever way they needed help.

[Doc. # 110, Ex. 4 at 29.]  Jacqueline testified that this agreement was to stay in place "until death."  *Id.* at 65.  Jacqueline considered this an oral agreement or oral contract.  *Id.* at 80.  The last time they discussed the agreement in detail was on Christmas Day 2004, when James reiterated that he would never let Deborah and her family have a penny of Jacqueline's money.  *Id.* at 47-48.

## B.     The Divorce and the Settlement Agreement

Jacqueline decided to divorce James in January 2005, after he refused to stop seeing Deborah.  James and Jacqueline did not discuss the PSRS designations after filing for divorce because their lawyers told them not to talk to each other about anything.

On October 14, 2005, James and Jacqueline concluded a "Marital Settlement and Separation Agreement," which is referenced in the Complaint and is a public record of which the Court takes judicial notice. [Doc. # 95, Ex. J.] That settlement agreement listed under "MARITAL PROPERTY TO BE AWARDED TO [JAMES]": "All right, title and interest in [James's] retirement, 401K or pension plan derived through his employment as a teacher including his retirement with the Public School Retirement System of Missouri." *Id.* at 10. The settlement agreement further stated:

> 16. Petitioner and respondent hereby exchange with and release to the other, any and all rights, claims and obligations either had, has or may acquire in law or equity arising out of the marital relationship, the parties agreeing that the marital rights of each are equal in value.

> 17. Petitioner and respondent acknowledge by signing this agreement that same constitutes a full and complete settlement of their respective rights against the other for all contractual obligations arising out of their marriage; and that this agreement constitutes a full division of their marital assets and marital liabilities . . . .

*Id.* at 4.

The divorce became final in October 2005. After the divorce, Jacqueline did not talk to James about their oral agreement because she believed it was settled. [Doc. # 110, Ex. 4 at 71.] James married Deborah in 2006.

After the divorce, PSRS sent James an annual one-page "Member Statement Account" that showed, among other things, the beneficiaries he had listed. In the years 2006, 2007, and 2008, under the heading of "Current Beneficiary Designations" were listed Jacqueline L. Scott as the primary beneficiary and Jeffrey A. Scott and Jennifer L. Scott as the first and

second contingent beneficiaries.  On the second page of the above statements, in the lower quadrant in small-print, is a statement reading: "Prior to retirement and upon a change in life status (marriage, divorce, birth or adoption), your beneficiary designation is void and benefits paid upon your death are made in accordance with the statutory succession of beneficiaries, unless you file a new Nomination of Beneficiary form."  [Doc. # 48, Ex. C at 2.]  Jacqueline testified that James had never mentioned the second page of these statements and that she did not think he had read information from PSRS discussing the effect of the new law which automatically cancelled his primary beneficiary designation.  [Doc. # 110, Ex. 5 at 65, 173.]

### C.    James's Death and the Distribution of Benefits

James died intestate on October 21, 2008.  James had been married to Deborah for approximately two years.  He had never taken action to change the beneficiary designation on his PSRS account to remove Jacqueline.

On November 3, 2008, PSRS sent a letter to Deborah informing her of her options for survivor benefit payments.  According to that letter:

> Legislation enacted August 28, 2005 [i.e., section 169.076] established a statutory succession of beneficiaries that applies if, at the time of the member's death a change in life status (i.e. marriage) has occurred since the member's previous beneficiary designation.  Since you and James William Scott were married after he completed his previous beneficiary designation you are designated as the primary beneficiary of Mr. Scott to receive any benefits due at his death.

[Doc. # 95, Ex. O.]  Since that time, PSRS has been paying those benefits to Deborah in the amount of $2,235.53 per month.

Jacqueline contacted PSRS in November and December of 2008 concerning distribution of James's benefits. PSRS responded that James's existing beneficiary designation had been automatically revoked by operation of Missouri law due to divorce, and that Jacqueline was no longer entitled to the benefits. Jacqueline did not mention the 2004 oral agreement to PSRS at that time.

On April 17, 2009, Jennifer and Jeffery objected to Deborah's Applications as Surviving Spouse in James's probate matter. One of the reasons for their objection was because they alleged that Deborah's application was unnecessary and excessive given the considerable assets left to Deborah outside probate.

### D.    Procedural Background

Plaintiffs' Second Amended Complaint contains four counts. Count I seeks damages under 42 U.S.C. § 1983, alleging that PSRS violated the Contracts Clause of the U.S. Constitution by impairing both James's contract with PSRS and Jacqueline's contract with James. Count II seeks damages from PSRS for the alleged violation of the Contracts Clause of the Missouri Constitution. Count III seeks a declaratory judgment and equitable relief based on the alleged constitutional inadequacy of section 169.076; Plaintiffs request injunctive relief ordering the individual PSRS Defendants and Deborah to pay James's retirement benefits either to Jacqueline for the benefit of Jeffery and Jennifer or directly to those children. Count IV seeks a constructive trust, restitution, and accounting.

On September 21, 2010, the Court granted in part and denied in part the Motion to Dismiss filed by PSRS and the individual PSRS Defendants. [Doc. # 89.] The motion was

granted as to Plaintiffs' claims based on James's contract with PSRS due to lack of standing. *Id.* at 8. The Court also found that PSRS was an arm of the state entitled to Eleventh Amendment immunity. *Id.* at 16-17. However, as to claims based on James's oral agreement with Jacqueline, the Court denied the motion with respect to Plaintiffs' claims against the individual Defendants. *Id.* at 26. Plaintiffs now proceed against the individual PSRS Defendants seeking injunctive relief and against Deborah Scott seeking a constructive trust, restitution, and accounting.

On January 7, 2011, the Court granted Plaintiffs' and the individual PSRS Defendants' motions to set the case for a bench trial. [Doc. # 123.]

## II.    Discussion

In moving for summary judgment, the individual PSRS Defendants assert the following theories: (1) section 169.076 did not impair the oral contract because section 461.051 already stated that divorce automatically revoked beneficiary designations; (2) the oral agreement is unenforceable because it lacks consideration, is not sufficiently definite, and is barred under the parol evidence rule; (3) the settlement agreement revoked Jacqueline as James's PSRS beneficiary; and (4) no reasonable factfinder could conclude that James and Jacqueline entered into the oral agreement. [Doc. # 95.] In addition to reinforcing those arguments, Defendant Deborah Scott contends that Plaintiffs are not entitled to a constructive trust under Missouri law and that laches and unclean hands bar equitable relief. [Doc. # 102.]

### A.    Whether Section 169.076 Impaired the Oral Contract

Defendants argue that, as a matter of law, Plaintiffs' claims under the Contracts Clause of the U.S. Constitution and the Missouri Constitution must fail. Because section 461.051 already provided that divorce automatically revoked a designation of a beneficiary's spouse, Defendants argue that the alleged oral contract could not have been impaired by section 169.076, since that 2005 statute did not change Missouri law regarding revocation of beneficiary designations in the event of divorce. [Doc. # 95 at 6.]

Article I, § 10, cl. 1 of the United States Constitution provides: "No State shall ... pass any Law impairing the Obligation of Contracts . . . ." Similarly, Article 1, § 13 of the Missouri Constitution states: "No . . . law impairing the obligation of contracts . . . can be enacted."[2]

In considering Contracts Clause claims, courts look first to whether a state law has operated to substantially impair a contractual relationship. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). To allege a Contracts Clause claim, Plaintiffs must establish: (1) a contractual relationship; and (2) a change in the law substantially impairing that contractual relationship. *See General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). If both components are satisfied, courts then consider whether the impairment is nevertheless justified as reasonable and necessary in serving an important public interest. *United States Trust Co. of New York v. New Jersey*, 431 U.S. 25 (1977).

---

[2] It appears that claims under the Missouri Contracts Clause are analyzed under the same considerations as are claims under the Contracts Clause in the Constitution of the United States. *See generally XO Missouri, Inc. v. City of Maryland Heights*, 256 F. Supp. 2d 966 (E.D. Mo. 2002) (performing a parallel analysis without discussing any differences in the reach of the two clauses).

On November 3, 2004, PSRS provided to Jacqueline a document titled "The Effect of Divorce on PSRS/NTRS Benefits," which stated that, for active PSRS members, "pursuant to Section 461.051 RSMo., the ex-spouse . . . shall automatically be removed as beneficiary as of the date of the divorce by operation of law." [Doc. # 95, Ex. C at 5.] Section 461.051, in the Missouri statutes' chapter on nonprobate transfers, provides in relevant part:

> 1. If, after an owner makes a beneficiary designation, the owner's marriage is dissolved or annulled, any provision of the beneficiary designation in favor of the owner's former spouse or a relative of the owner's former spouse is revoked on the date the marriage is dissolved or annulled, whether or not the beneficiary designation refers to marital status. The beneficiary designation shall be given effect as if the former spouse or relative of the former spouse had disclaimed the revoked provision.
>
> 2. Subsection 1 of this section does not apply to a provision of a beneficiary designation that has been made irrevocable, or revocable only with the spouse's consent . . . .

Mo. Rev. Stat. § 461.051.

Under the plain terms of subsection 2 of section 461.051, subsection 1 does not apply to a provision of a beneficiary designation that has been made irrevocable or revocable only with the spouse's consent. Jacqueline testifies that she and James made a contract to leave each other as beneficiaries after their divorce. Such a contract causes the beneficiary designations to become either irrevocable or revocable only with the spouse's consent by contract modification. *See*, *e.g.*, *Gen. Amer. Life Ins. Co. v. Rogers*, 539 S.W.2d 693, 697 (Mo. App. 1976) ("The law in Missouri and elsewhere is clear that a contract obligating the insured to maintain a present policy in full force and effect for the benefit of certain beneficiaries named pursuant to an agreement is valid and that the beneficiaries so named

acquire a right in the proceeds of the policy which will be protected against subsequently named beneficiaries who have no superior right."); *Stephenson v. Village of Claycomo*, 246 S.W.3d 22, 27 (Mo. Ct. App. 2007) ("As with the initial creation of a contract, modification of a contract requires the mutual assent of the parties."). Thus, under the facts viewed in the light most favorable to Plaintiffs, subsection 2 of section 461.051 controls and subsection 1 does not apply.

Four years after the PSRS letter to Jacqueline citing section 461.051, a November 3, 2008 letter to Deborah from PSRS cited section 169.076 – which became effective in August of 2005, shortly before the divorce became final. [Doc. # 95, Ex. O.] Section 169.076, which is specific to "Teacher and School Employee Retirement Systems," provides in relevant part:

> The member's marriage, divorce, withdrawal of accumulated contributions, or the birth of the member's child, or the member's adoption of a child, shall result in an automatic revocation of the member's previous designation in its entirety upon the retirement system receiving actual notice of such event before or after the member's death and prior to any payments being made under the provisions of this chapter. This section applies to all beneficiary designations filed with the retirement system before or after August 28, 2005, under which payments have not been made under this chapter.

Mo. Rev. Stat. § 169.076.2. Section 169.076 contains no exception for a beneficiary designation that has been made irrevocable or revocable only with the spouse's consent. Therefore, section 169.076 changed the law in a way that a reasonable factfinder could conclude substantially impaired the contractual relationship between Jacqueline and James.

Defendant Deborah Scott further argues that *Whirlpool v. Ritter*, 929 F.2d 1318 (8th Cir. 1991) is inapposite. However, as the Court has already explained in its September 21, 2010 Order:

> The *Whirlpool* court reasoned that a party designating a beneficiary was entitled to expect that his or her wishes – as expressed in a contract which pre-dated the divorce-revocation statute – would be honored. *Whirlpool*, 929 F.2d at 1322. . . . While other courts have disagreed with *Whirlpool*, in the absence of contrary direction from the Eighth Circuit, the Court is bound to follow *Whirlpool*'s guidance.

[Doc. # 89 at 25.] Defendant Deborah Scott cites no contrary caselaw, but rather lists factual differences between this case and *Whirlpool*. [Doc. # 102 at 8.] In the absence of contrary caselaw, the Court declines to distinguish away *Whirlpool* based on minor factual differences.

## B. Whether the Oral Agreement is Enforceable

The individual PSRS Defendants argue that the oral agreement described in Jacqueline's testimony is not enforceable as a matter of law because: (1) there was no consideration, (2) the oral agreement was not sufficiently definite, and (3) the parol evidence rule operates to bar Jacqueline's allegations.

### 1. Whether there was Consideration

The individual PSRS Defendants argue that James's promise to Jacqueline was gratuitous because there was no consideration. Plaintiffs and the individual PSRS Defendants agree that the relevant rule is as stated in *Cash v. Benward*: either a detriment to the promisee or a benefit to the promisor can constitute sufficient consideration to support

a contract. 873 S.W.2d 913, 916 (Mo. Ct. App. 1994). "Detriment to a promisee may consist of doing anything he is not legally bound to do or by refraining from doing anything he has a right to do." *Id.*

Here, the individual PSRS Defendants note that because Jacqueline had selected Option 2, she could not change her designated beneficiary upon divorce, unless she subsequently remarried and named her new spouse as her survivor beneficiary within ninety days. According to this theory, Jacqueline was legally obligated to keep James as her survivor beneficiary, and therefore her agreement to keep James as her primary beneficiary did not constitute consideration. [Doc. # 95 at 9.]

The individual PSRS Defendants' theory must fail because it ignores the terms of the oral contract described in Jacqueline's testimony. Jacqueline testified:

> [James] told me that he would not allow Deborah and her family to have any of my teacher retirement, and that he wanted me to do likewise. He would keep me as beneficiary and I would disburse my money to the children for education and help in whatever way they needed help.

[Doc. # 110, Ex. 4 at 29.] Jacqueline testified that this agreement was to stay in place "until death." *Id.* at 65.

Jacqueline made two promises, either of which could constitute consideration: (1) she would keep James as her beneficiary, and (2) she would disburse the money to their children for education and help in whatever way they needed. The individual PSRS Defendants ignore the second promise. Additionally, the first promise is not rendered legally gratuitous by the fact that Jacqueline could not yet remove James as her beneficiary because she had

not remarried. At the time Jacqueline made that promise, she could not have been certain when James would die or if she would remarry.

For these reasons, a reasonable factfinder could conclude that both a legal detriment to Jacqueline and a legal benefit to James occurred. Therefore, the oral contract is not unenforceable for lack of consideration as a matter of law.

### 2. Whether the Oral Agreement was Sufficiently Definite

The individual PSRS Defendants also assert that the contract is unenforceable because its terms are not sufficiently definite. The individual PSRS Defendants cite *Asbury v. Crawford Elec. Coop., Inc.,* which stated:

> In Missouri a court will enforce an oral contract if (1) the contract is definite; (2) it is proved as pleaded; (3) it is established by recent definite conversations; (4) it is fair; (5) the proof leaves no reasonable doubt that the contract was made and full performance, as far as possible, has been had; (6) the performance is referable solely to the contract; (7) the contract is based upon adequate consideration; and (8) a real contract rather than a mere disposition to agree, is shown.

51 S.W.3d 152, 156-57 (Mo. Ct. App. 2001) (citing *Rohrer v. Rohrer*, 731 S.W.2d 883, 884 (Mo. Ct. App. 1987)). *Asbury* – involving an oral contract for electrical service in exchange for a payment to a third party for an easement – did not apply this rule in detail, as the court easily found an oral contract on the record.

The Court quoted *Asbury* in its September 21, 2010 Order in the context of a statute of frauds analysis – an issue that the Court itself had raised at oral argument. There, the Court concluded that it could not say that this oral agreement was unenforceable for failure to comply with a statutory requirement of writing. [Doc. # 89 at 24.] In these motions for

14

summary judgment, Defendants make no attempt to argue that the oral contract falls within Missouri's statute of frauds.  *See* Mo. Rev. Stat. § 432.010.

Missouri caselaw does not always make clear whether the eight canons for the enforcement of an oral contract listed in *Asbury* constitute merely an exception to the statute of frauds or apply even to oral contracts not falling within the statute of frauds.  *Asbury*, citing only *Rohrer v. Rohrer*, used broad language and made no reference to the statute of frauds.  51 S.W.3d at 157 (citing *Rohrer*, 731 S.W.2d at 884 (affirming nonexistence of alleged oral contract between a deceased husband and his wife to execute irrevocable joint wills)).  The cases cited by *Rohrer* explicitly applied the eight canons in the context of the statute of frauds.  731 S.W.2d at 884 (citing *Holt v. Story*, 642 S.W.2d 394, 396 (Mo. Ct. App. 1982) (alleged oral modification to a written real estate contract); *Gegg v. Kiefer*, 655 S.W.2d 834 (Mo. Ct. App. 1983) (alleged oral contract to sell real estate)).

In the classic case of *Walker v. Bohannan*, which appears to have originally summarized those eight canons, the Missouri Supreme Court explained:

> With the acquired experience the courts had gained before the passage of the original statutes of frauds and perjuries, they were slow to ingraft thereon any exception to the iron-clad rule of the statute.  Later, however it became apparent to courts of conscience that frauds were being perpetrated under the strict letter of the statute.  To obviate these frauds, the exception to the statute here invoked was adopted by courts of equity, but not without well-defined rules of procedure – rules, which like the statute itself, would be a safeguard as against the perpetration of frauds.  The rules cover many phases; i. e., (1) the alleged oral contract must be clear, explicit, and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair, and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt

in the mind of the chancellor that the contract as alleged was in fact made, and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand, but not upon the other, would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed made before the acts of performance relied upon were had.

147 S.W. 1024, 1028-29 (Mo. 1912). Nearly thirty years later, the Missouri Supreme Court posed the rhetorical question whether its analysis had violated the canons laid down in *Bohannan* that an oral contract must be clear, explicit and definite and established by evidence of conversations not too loose or casual. *Sportsman v. Halstead*, 147 S.W.2d 447, 298 (Mo. 1941) (alleged oral contract that plaintiffs should receive whatever property deceased might leave at death, if they would care for him so long as he might live). The *Sporstman* court explained that it had not gone too far in upholding the oral contract because while the statue of frauds was enacted to prevent frauds and perjuries, the equitable exception grafted onto the statute had the same purpose, and therefore "neither should be permitted to become an instrument of oppression." *Id.* at 298-99. *Sportsman* went on:

To require technical accuracy of expression on the part of lay witnesses with little knowledge of the law of real estate, conveyancing and contracts, would make impossible the establishment of such oral contracts by the untutored. The witnesses may speak their own language if, with its background and context, their thought and meaning are clear and the contract is adequately and definitely proven on the whole record.

*Id.* at 299.

Outside the context of the statute of frauds, Missouri courts have applied the less stringent rule that an oral contract is formed only where its content is certain and definite. *See Around the World Importing, Inc. v. Mercantile Trust Co., N.A.*, 795 S.W.2d 85, 90 (Mo. Ct. App. 1990) (alleged oral contract for financial planning services); *Tom's Agspray, LLC v. Cole*, 308 S.W.3d 255, 259 (Mo. App. 2010) ("To show a 'meeting of the minds,' the plaintiff must show that the terms of the [oral] contract [for seeding services] were certain or capable of being made certain."). As the individual PSRS Defendants note, courts are guided by principles of law applied with common sense and in light of experience when determining whether the terms are too uncertain to create an enforceable contract. [Doc. # 95 at 11.] The individual PSRS Defendants also cite *Dennis Chapman Toyota, Inc. v. Belle State Bank*, 759 S.W.2d 330, 335 (Mo. Ct. App. 1988), where an alleged oral financing contract was too vague and uncertain to be enforced because certain commercial terms were not included. *Id.* Thus, it appears that the eight *Bohannan* canons for enforcing oral contracts do not apply where the oral contract at issue does not fall within the statute of frauds.

Regardless, the individual PSRS Defendants argue only that the contractual terms were not definite and that the contract cannot be established by recent, definite conversations. First, a reasonable factfinder could conclude that the terms of the contract are definite. Jacqueline has testified that she and James exchanged two promises: (1) they would keep each other as beneficiaries, and (2) they would disburse the money to their children. These

terms are simple and definite, and a reasonable factfinder could conclude that there was a meeting of the minds.

Second, a reasonable factfinder could conclude that there was a contract established by recent, definite conversations. Echoing *Bohannan*, the Missouri Court of Appeals in *Burgess v. White* described this requirement as prohibiting establishment of an oral contract "by conversations either too ancient or too loose or casual." 565 S.W.2d 854, 856 (Mo. Ct. App. 1978) (finding an exception to the statute of frauds). These conversations from late 2004 are hardly ancient. Jacqueline's testimony describes serious conversations that the Court would not characterize as casual. A reasonable factfinder could find sufficiently definite – as opposed to "loose" – terms in the two promises exchanged.

### 3. The Parol Evidence Rule and the Divorce Settlement Agreement

The individual PSRS Defendants also argue that the oral agreement is unenforceable under the parol evidence rule because that rule prohibits evidence of prior agreements that vary or contradict the terms of an unambiguous and complete contract, such as the divorce settlement agreement here. [Doc. # 95 at 13.] The individual PSRS Defendants rely heavily on *Whitehill v. Whitehill*, where the Missouri Court of Appeals affirmed summary judgment because the parol evidence rule barred consideration of an alleged oral agreement between a husband and wife which contradicted the terms of a written settlement agreement regarding an annuity created from the husband's personal injury lawsuit. 218 S.W.3d 579 (Mo. Ct. App. 2007). *Whitehill* concisely stated the rule: "In the absence of fraud, accident, mistake, or duress, the parol evidence rule prohibits evidence of prior or contemporaneous oral

agreements which vary or contradict the terms of an unambiguous, final and complete writing." *Id.* at 586 (quoting *Blackburn v. Habitat Dev. Co.*, 57 S.W.2d 378, 386 (Mo. App. 2001)). "A contract is integrated where it constitutes a complete statement of the bargain made between the parties." *Exec. Bd. of Mo. Baptist Convention v. Carnahan*, 170 S.W.3d 437, 448 (Mo. Ct. App. 2008) (citation omitted). "The parol[ ] evidence rule bars extrinsic evidence, unless an integrated contract is ambiguous." *Id.* (quoting *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 361 (Mo. 1961) (en banc)).

If the divorce settlement unambiguously discharged the oral contract regarding benefits after James's death, then the parol evidence rule would bar any extrinsic evidence to the contrary. In its September 21, 2010 Order, the Court explained that whether a written settlement agreement forfeits a former spouse's interest in retirement benefits is a question of fact. [Doc. # 89 (citing *Nat'l Auto. Dealers & Assocs. Ret. Trust v. Arbeitman*, 89 F.3d 496, 500 (8th Cir. 1996)).]

"The rule in Missouri is as follows:

[W]here the forms of a separation agreement carried into a divorce decree plainly disclose an intent to remove the named beneficiary in a life insurance policy [or retirement plan] from all rights to the proceeds thereof, such agreement may operate to prevent the named beneficiary from claiming the proceeds upon the death of the insured . . . ."

*Estate of Keeton*, 728 S.W.2d 694, 697 (Mo. Ct. App. 1987) (alteration in *Estate of Keeton*) (quoting *Bell v. Garcia*, 639 S.W.2d 185, 191 (Mo. Ct. App. 1982)). "The 'spouse's rights as a beneficiary are extinguished only by terms specifically divesting the spouse's rights as

a beneficiary under the policy or plan.'" *Arbeitman*, 89 F.3d at 500 (quoting *Lyman Lumber Co. v. Hill*, 877 F.2d 692, 693 (8th Cir. 1989)).

In *Arbeitman*, the Eighth Circuit considered a similar settlement agreement in conjunction with facts surrounding a divorce and affirmed a trial finding that the agreement did not divest an ex-spouse of pension plan benefits. Though in the context of an ERISA case, the Eighth Circuit focused on the question of whether the agreement made the former spouses' intent clear. There, the decedent's second wife argued that the ex-wife forfeited her rights as designated beneficiary when she executed a separation agreement which stated that she "relinquishe[d] any right, title or interest in and to any . . . pension plans . . . .'" 89 F.3d at 499-500. The Eighth Circuit reasoned:

> Although these words could include [the ex-wife's] interest in the [pension] plan, additional language in the agreement undermines this conclusion. The same paragraph of the separation agreement states that the parties accept the provisions of the agreement in satisfaction of property rights and support obligations "otherwise *arising out of the marital relationship*" . . . . Significantly, there is no mention of the plan benefits [as opposed to the "pension plans"] in the separation agreement. . . . [T]he record demonstrates that [the ex-husband] intended for [the ex-wife] to be the beneficiary of the [pension] plan.

*Id.* at 501.

Here, the written settlement agreement listed under "MARITAL PROPERTY TO BE AWARDED TO [JAMES]": "All right, title and interest in [James's] retirement, 401K or pension plan derived through his employment as a teacher including his retirement with the Public School Retirement System of Missouri." [Doc. # 95, Ex. J at 10.] In contrast to this language, in *Estate of Keeton* the separation agreement clearly transferred the plan's benefits:

"the wife does transfer any right, title, interest and benefit in and to the said life insurance policies that she may have, relinquishing to husband the full ownership or benefit and control thereto . . . ." 728 S.W.2d at 696. The settlement agreement here further stated:

> 16. Petitioner and respondent hereby exchange with and release to the other, any and all rights, claims and obligations either had, has or may acquire in law or equity *arising out of the marital relationship*, the parties agreeing that the *marital* rights of each are equal in value.

> 17. Petitioner and respondent acknowledge by signing this agreement that same constitutes a full and complete settlement of their respective rights against the other for all contractual obligations *arising out of their marriage*; and that this agreement constitutes a full division of their *marital* assets and *marital* liabilities . . . .

*Id.* at 4 (emphasis added). Under the Eighth Circuit's analogous reasoning in *Arbeitman*, this contract language leaves open the question of whether the survivor benefits were included in the settlement agreement, especially considering the evidence that James intended for Jacqueline to be the beneficiary by the terms of their oral agreement.

The Missouri Supreme Court's decision in *Silcox v. Silcox* adds another layer of doubt concerning the coverage of the separation agreement. There, the court held that PSRS retirement funds could not be considered as marital property upon dissolution. 6 S.W.3d 899, 902 (Mo. 1999) (en banc) (citing Mo. Rev. Stat. § 169.572.2, providing that PSRS accounts must be treated in the same manner as Social Security benefits). As *Whitehill* suggested, the parol evidence rule does not apply to bar evidence of an oral contract in the case of mistake. 218 S.W.3d at 586; *see also Brown v. Mickelson*, 220 S.W.3d 442, 448 (Mo. Ct. App. 2007) ("Parol evidence is admissible to show that because of mutual mistake

the writing did not reflect the intentions of the parties.") (citations omitted). Here, the settlement agreement listed James's PSRS plan under "MARITAL PROPERTY TO BE AWARDED TO [JAMES]." [Doc. # 95, Ex. J at 10.] Therefore, even the parties' intent to include the PSRS plan as marital property – with no mention of future benefits – raises the specter of mistake, providing another reason to admit parol evidence in this case.

As the caselaw indicates, at the very least, the divorce settlement agreement here is ambiguous with respect to the PSRS benefits. Because there is not unambiguous, complete integration, the parol evidence rule does not apply to bar the testimony at issue. For the same reasons, the individual PSRS Defendants' related argument that, as a matter of law, the settlement agreement revoked Jacqueline as a beneficiary also fails. As the Court indicated in its previous Order, these are questions of fact. Especially in a case such as this that will turn primarily on credibility, these factual issues are not properly resolved on a motion for summary judgment.

## C.        Whether a Reasonable Factfinder could Conclude that there was an Oral Agreement

The individual PSRS Defendants also assert that no reasonable factfinder could conclude that James and Jacqueline entered into the oral agreement because Plaintiffs' only evidence is inadmissible hearsay and Plaintiffs have acted inconsistently with the oral contract they allege. [Doc. # 95 at 18-20.]

With respect to the hearsay argument, the Eighth Circuit has provided a clear answer:

> The hearsay rule excludes out-of-court assertions used to prove the truth of the facts asserted in them. Verbal acts, however, are not hearsay because they are not assertions and not adduced to prove the truth of the matter. The Federal Rules of Evidence "exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights."

*Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) (quoting Fed. R. Evid. 801(c), advisory committee's note).

Here, Jacqueline's testimony that James exchanged promises with her regarding their PSRS benefits is not asserted to prove the truth of the matter asserted – i.e., that Jacqueline was James's designated primary beneficiary. Rather, Jacqueline's testimony is offered to prove that the parties bound themselves to an oral contract through this verbal act. [Doc. # 110 at 54.] Therefore, such testimony is admissible under the Federal Rules of Evidence.

In making their second argument – that no reasonable factfinder could conclude that there was an oral agreement because Plaintiffs have acted inconsistently with such an agreement – the individual PSRS Defendants cite only cases supporting the proposition that plaintiffs cannot avoid summary judgment by contradicting their own previous testimony and statements. *See*, *e.g.*, *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995). However, neither the individual PSRS Defendants nor Defendant Deborah Scott have identified any clearly inconsistent positions held by Plaintiffs. Defendants note that on April 17, 2009, Jennifer and Jeffery objected to Deborah's Applications as Surviving Spouse in James's probate matter. One of the reasons for their objection was because they alleged that Deborah's application was unnecessary and excessive given the considerable assets left to Deborah

outside probate.  However, Defendants have not presented the Court with specific evidence that any of the Plaintiffs have ever argued that Deborah was legally entitled to those benefits – as opposed to stating the fact that PSRS was paying those benefits to her.  While the evidence is relevant, the Court cannot say on this record that no reasonable fact finder could rule in Plaintiffs' favor as a result of this evidence.

To the extent that Defendants' are arguing for estoppel, the result would be the same. Last year, the Eighth Circuit was presented with a similar argument, that an opposing party had altered its legal position from an underlying suit.  *Capella Univ., Inc. v. Exec. Risk Specialty Ins. Co.*, 617 F.3d 1040,1051 (8th Cir. 2010).  There, the Eighth Circuit recognized that the U.S. Supreme Court had applied three factors in analyzing such arguments:

> First, a party's later position must be clearly inconsistent with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)).  Because the Defendants have failed to satisfy the first prong of the *New Hampshire* test - clear inconsistency - the Court need not analyze the second and third considerations.

In sum, as mentioned above, this case hinges on credibility determinations, which are for a factfinder to make.  *See Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001).  It

would be inappropriate for the Court to make credibility findings in the context of a summary judgment motion in order to dispose of the case.

### D. Whether Missouri Law Bars Plaintiffs from Equitable Relief

In addition to reinforcing some of the arguments made by the individual PSRS Defendants, Defendant Deborah Scott contends that Plaintiffs are not entitled to a constructive trust under Missouri law and that laches and unclean hands bar equitable relief.

Deborah's "laches and unclean hands" argument cites no caselaw, but merely asserts that equitable relief is not a right and refers to Plaintiffs' failure to assert their arguments previously. [Doc. # 102 at 15.] This argument is similar to the judicial estoppel argument analyzed above. "Such conduct as will disqualify a party from equitable relief need not be fraudulent, but simply indicative of a lack of good faith in the subject matter of the suit." *State ex. rel Sasnett v. Moorhouse*, 267 S.W.3d 717, 723 (Mo. Ct. App. 2008) (quoting *State ex. rel KelCor. Inc. v. Nooney Realty Trust, Inc.*, 966 S.W.2d 399, 404 (Mo. Ct. App. 1998)). The Court declines to find that Plaintiffs have unclean hands as a matter of law for failure to previously mention the oral contract.

"The invocation of laches requires that a party with the knowledge of facts giving rise to its rights unreasonably delays asserting them for an excessive period of time and the other party suffers legal detriment therefrom." *Id.* (quoting *Scheble v. Mo. Clean Water Comm'n*, 734 S.W.2d 541, 560 (Mo. Ct. App. 1987)). Here, the Court finds no unreasonable delays for an excessive period in the assertion of Plaintiffs' rights that caused a legal detriment to

Defendants. This case was filed in 2009, approximately a year after PSRS began to pay out the benefits to Deborah.

Deborah's argument that Plaintiffs are not entitled to a constructive trust as a matter of law relies entirely on a case that she concedes was decided on an earlier version of Missouri's dead man's statute. [Doc. # 102 at 11 (citing *Forester v. Bellville*, 513 S.W.2d 726 (Mo. Ct. App. 1974)).] This argument begins with the assertion: "If Plaintiffs self serving [sic] characterizations of James Scott's alleged statements were excluded from evidence, there would be absolutely no evidence of any contract between James and his ex-wife." *Id.* at 12. However, Deborah offers no legal authority by which this Court may override Missouri's 1985 abrogation of its dead man's statute. *See* Mo. Rev. Stat. § 491.010; Fed. R. Evid. 601. Missouri law offers the equitable remedy of a constructive trust, under certain limited circumstances to prevent the unjust enrichment that would otherwise occur if a person were allowed to unfairly retain property. *See Ralls County Mut. Ins. Co. v. RCS Bank*, 314 S.W.3d 792, 795 (Mo. Ct. App. 2010).

> However, the very essence of the remedy of a constructive trust is the identification of specific property or funds as the res upon which the trust may be attached. To establish a constructive trust, evidence must be unquestionable in character and so clear, cogent and convincing as to exclude every reasonable doubt in the mind of the trial court.

*Id.* at 795-96 (internal quotations omitted). Such an evidentiary determination is not appropriate on a motion for summary judgment as the record now stands.

## III.    Conclusion

Accordingly, it is hereby ORDERED that Defendants' motions for summary judgment

[Docs. # 94, 100] are DENIED.


                                        s/ NANETTE K. LAUGHREY
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated: January 24, 2011
Jefferson City, Missouri